1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
- - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,   :  17-CR-0004(JJM)
                             :
                             :
                             :
                             :
                             :
     vs.                     :  United States Courthouse
                             :  Providence, Rhode Island
                             :
                             :
                             :
 JAY GACCIONE,               :  Friday, June 28, 2019
         Defendant.          :
                             :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOHN J. MCCONNELL, JR.
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   DENISE M. BARTON, AUSA
                      U.S. Attorney's Office
                      50 Kennedy Plaza, 8th Floor
                      Providence, RI  02903

For the Defendant:    KEVIN J. FITZGERALD, AFPD
                      FEDERAL DEFENDER'S OFFICE
                      10 Weybosset Street, Suite 300
                      Providence, Rhode Island  02903


Court Reporter:   Lisa Schwam, CSR, CRR, RPR, RMR
                  One Exchange Terrace
                  Providence, RI  02903


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

```
1                   (In open court; 10:16 a.m.)
2            THE COURT:  Good afternoon, everyone.  We're
3     here this morning -- I'm sorry.  Good morning,
4     everyone.  We're here this morning for sentencing in
5     the case of the United States vs. Jay Gaccione, 17-4.
6            Would counsel identify themselves for the
7     record.
8            MS. BARTON:  Good morning, your Honor.  Denise
9     Marie Barton for the United States.
10           THE COURT:  Good morning, Ms. Barton.
11           MR. FITZGERALD:  Kevin Fitzgerald for Mr.
12    Gaccione.
13           THE COURT:  Good morning, Mr. Fitzgerald.  Mr.
14    Gaccione.
15           THE DEFENDANT:  Good morning.
16           THE COURT:  Mr. Gaccione, did you receive a copy
17    of the presentence report that the probation department
18    issued?
19           THE DEFENDANT:  Yes, I did.
20           THE COURT:  Did you review that with your
21    lawyer?
22           THE DEFENDANT:  Yes.
23           THE COURT:  Did he answer any questions that you
24    had about that?
25           THE DEFENDANT:  Yes.
```

1          THE COURT:  How we're going to proceed this

2     morning, I'm going to review the calculation of the

3     guideline range.  We'll go through that.  I'll see if

4     there's any objections to that or the presentence

5     report.  If there are, I will rule on them.

6          The government will then make its sentencing

7     recommendation.  I understand from my clerk that there

8     may be a victim statement?

9          MS. BARTON:  Yes, your Honor.

10         THE COURT:  Okay.  Your lawyer will then be able

11    to make his sentencing recommendation.  You'll be

12    allowed to speak if you choose to.  You don't have to.

13    It's purely up to you.

14         And then I'll get on with the sentence, okay?

15         THE DEFENDANT:  Thank you.

16         MR. FITZGERALD:  Thank you.

17         THE COURT:  The guidelines are complicated, and

18    I rely on those as presented in the presentence report,

19    but let me summarize them as best I can.

20         Counts Seven, Eight and Nine, which have to do

21    with distribution and possession of child pornography

22    carries with it a base offense level of 22.  There's a

23    five-point increase because the distribution involved

24    consideration; that is, there was payment or other

25    consideration for the distribution.  There's five

1    points added because the pattern of activity involved

2    sexual abuse or exploitation of a minor.  There's two

3    points added for the use of a computer.  There's two

4    points added because of the number of images involved,

5    for an adjusted offense level of 36.

6            Count One, which is the sexual exploitation of a

7    minor, carries with it a base offense level of 32.

8    There are two points added because the age of the minor

9    was between 12 and 16.  There are two points added

10   because the defendant admitted to engaging in sexual

11   intercourse with Minor Victim #1.  There are two points

12   added because the distribution was raised to the level

13   of knowing distribution.  There are two points added

14   because the defendant is the father of the Minor Victim

15   #1, for an adjusted offense level of 40.

16           That's the same guideline calculation for Count

17   Two, Count Three, Count Five, Count Six.  Because there

18   are multiple counts, the multiple-count adjustment has

19   six units for the counts which adds five points for a

20   combined offense level of 45.  And a Chapter 4

21   enhancement because the defendant is a repeat and

22   dangerous sex offender against minors, five points are

23   added for a total offense level of 50.  There are three

24   points -- I assume the government wishes to make a

25   motion on the third point?

1          MS. BARTON:  Yes, your Honor.

2          THE COURT:  Three points reduction for

3    acceptance of responsibility.  And because the

4    guidelines don't allow an offense level to be greater

5    than 43, the offense level is 43.

6          Mr. Gaccione has no criminal history points and

7    therefore is a category I.  Total offense level of 43,

8    Criminal History Category I, carries with it a

9    recommended period of incarceration of 2,280 months,

10   which I believe is approximately 190 years.

11         Ms. Barton, any objection to the calculation of

12   the guidelines or to the presentence report?

13         MS. BARTON:  No objection, your Honor.

14         THE COURT:  You hesitated.

15         MS. BARTON:  Oh, the only objection -- it's not

16   objection, your Honor -- is your Honor set forth a

17   number of months of 2,280 months.  I believe that was

18   the statutory maximum period, whereas the guideline

19   chart sets forth life as the guideline range.  And that

20   was my hesitation, your Honor.

21         THE COURT:  I appreciate that.  The guideline

22   chart says life, but let me -- I'll accept that.

23         MS. BARTON:  Thank you.

24         THE COURT:  Mr. Fitzgerald, any objection to the

25   PSR or to the guideline range?

1          MR. FITZGERALD:  No, your Honor.

2          THE COURT:  Great.  Thank you.

3          Ms. Barton, I'll hear from the government.

4          While you're preparing, Ms. Barton, the Court in

5    addition received a sentencing memorandum from the

6    government, received one from Mr. Fitzgerald on behalf

7    of Mr. Gaccione and also received a victim's letter as

8    well.  I've considered all those, and thank you all for

9    that input.

10         Ms. Barton.

11         MS. BARTON:  Thank you, your Honor.  Your Honor,

12    let me begin by addressing the government's sentencing

13    recommendation.

14         As your Honor has seen in our memorandum, the

15    government has recommended a term of 60 years

16    imprisonment for this defendant.  It did not arrive

17    lightly at that decision, but the recommendation just

18    as easily could have been 75 years, a hundred years or

19    150 years.  The point of the government's

20    recommendation is that Mr. Gaccione serve a lifetime

21    sentence and that he never set forth out of prison.

22    This crime warrants it.

23         The information that was set forth in the

24    government's sentencing memorandum and that will be

25    discussed here in summary is difficult to hear.  What

1   the defendant did and how the victim has suffered is

2   revolting.  It was revolting to write, it was revolting

3   to learn of, and it will be revolting to discuss it

4   here.  And while I will try and discuss it as the

5   decorum of this courtroom requires, we are here because

6   the defendant raped, molested and abused his daughter

7   so I do need to speak frankly about what did happen.

8           The sentence that the government has requested

9   and that we believe is the right sentence in this case

10  must address, of course, all the 3553(a) factors, but

11  what I do not want to be lost among all of those

12  technical factors in the statute is the harm that this

13  victim has suffered.  The victim, the defendant's

14  eldest daughter, who was between 12 and 14 years at the

15  time that he repeatedly molested her, is not here

16  today.  She didn't want to come.  She didn't want to

17  see her father.

18          I've met with the victim a few times throughout

19  this investigation and during the pendency of this

20  case, and I've spoken with her mother a number of

21  times.  This victim at the time that her father

22  molested her was a young girl who was struggling

23  socially, emotionally and academically, all of which

24  was certainly known to her father.  She was a child who

25  did not have a lot of friends.  She was, for lack of a

1    better term, a bit of a social outcast.  She had at the

2    time that we met her during this investigation what she

3    called one friend.  That friend was also a bit of an

4    outcast.  She was a child who had I believe muscular

5    dystrophy and she was in a wheelchair, and she has

6    actually since passed away.

7         This child was basically an isolated child.  She

8    also was one that had some responsibilities for caring

9    for her younger brothers and sisters because her mother

10   was working full-time trying to support the family.

11   Her father took advantage of her social isolation, the

12   fact that she was somebody who struggled and the fact

13   that she had some emotional difficulties.  She also was

14   at the time on an IEP at school for several challenges

15   she had academically and emotionally.  She lived in,

16   essentially, a house of horrors for the time that her

17   father was abusing her and was taking pictures of that

18   abuse, further compounding the harm that she suffered

19   at his hands.

20        She struggled all through that time, as one

21   could clearly imagine, with just this series of

22   conflicting emotions, fear, shame, embarrassment,

23   trying to reconcile that this was her father, somebody

24   she was supposed to be able to trust and love, learn

25   from and look up to and yet he took away her childhood

1    and he abused her in simply unspeakable ways.

2              When I met with her the week after the case was

3    brought to us, this child was essentially a shell.  She

4    had an incredibly hard time talking about what was done

5    to her, what her father did, and as was provided in

6    discovery to defense counsel as well as to the

7    probation officer, you can see in the videotaped

8    interview of her, she's almost robotic and has this

9    lack of affect in the way she talks of the sex acts

10   that her father had her do and his directing her to

11   masturbate or show her genitals and breasts and the

12   other acts.

13             I met with her again on Tuesday with her mother.

14   This child only took advantage of the counseling

15   services that were offered by Day One as well as a

16   private counselor down near her home for a short period

17   of months.  It wasn't something she's ready to do.

18   Like many victims of sexual trauma, especially a child,

19   she simply hasn't come to terms with what has happened

20   to her, and she probably will not come to terms with it

21   for some period of time.  And I don't think that it is

22   disingenuous for me to say that she will never fully

23   recover.

24             I think all of us in this courtroom are

25   particularly aware over the past year from hearing of

1    sexual abuse survivor stories, some of these people

2    never recover from it.  I think it is reasonable to say

3    to this Court that this child is going to suffer the

4    scars of her father's abuse for the rest of her life.

5         In addition to stopping counseling, she

6    struggled in school in her hometown after her arrest,

7    partly because of the publicity, partly because she was

8    just struggling with what had happened to her and her

9    father was out of the house and the change in her

10   family.  She missed a lot of school.  There was truancy

11   court, and she was unable to complete coursework.

12        She changed schools and moved to go live with a

13   relative.  She was doing better for a period of time

14   but then continued to struggle, and she's dropped out

15   of school.  She is now trying to get her GED, but she's

16   struggling because this child, who is 17 years old now,

17   she can't fully read.  This defendant basically took

18   away years of her academic learning because he abused

19   her for this time, and because she was struggling

20   during this period of abuse and has been, she's not

21   been able to go to school and complete her coursework

22   which will follow her through the rest of her life.

23   She's trying, but it's exceptionally hard for her.  Her

24   mother can speak more to this.

25        What I'm trying to convey to the Court is that

1   the defendant's molestation of her and the defendant's

2   photographing of her has caused such a spiral of

3   problems for this victim, and it is something that will

4   take her years to recover from, if she ever does.  The

5   nature of this crime warrants the sentence that the

6   government has requested and warrants a life sentence,

7   whatever the Court thinks that that sentence should be.

8   The defendant's actions, although they would be equally

9   heinous or they would be heinous if they occurred on

10   one event, if there was one incident of molestation,

11   that's not what we have in this case.

12        This is a man -- so we look to his history and

13   characteristics of the defendant -- who for a period of

14   years, for approximately one time, two times per week,

15   would molest his daughter forcing her to have

16   intercourse, orally copulate him, he would do the same

17   to her, he would direct her to masturbate, he would

18   cause her to pose and show herself; acts that no child

19   should have to go through and certainly not at the

20   hands of her father.

21        There was no sign of this stopping.  What

22   stopped it was the arrival of the authorities in the

23   execution of that search warrant at that house of

24   horrors.  This defendant is a danger to society.  We

25   know that he abused his daughter.  We saw the pictures.

1      We heard her statement, and we have his admission.

2          We also know that this defendant is a danger to

3      society and is a risk to children.  Although it is

4      secondary to the harm that he caused to his daughter,

5      what cannot be forgotten by this Court in sentencing is

6      that we came to this case because he was tied up in an

7      investigation involving another target in South Africa.

8          In the PSR, there is transcription or statements

9      of the chats that transpired between this defendant and

10     the man in South Africa.  And in those chats, the

11     defendant is talking -- and I'm obviously paraphrasing

12     here because the Court has the material -- but the

13     defendant is speaking with this man, Mr. K'An Burne, in

14     South Africa, about Mr. Burne's 3- and 5-year-old

15     children.

16         When Mr. Burne is explaining that he does engage

17     in sex acts with his toddler and preschool age

18     children, Mr. Gaccione asked him for pictures and then

19     asked him specifically if he has any with cum on it.

20     He then talks about how he is getting hot thinking

21     about how you can just do anything to any of them.

22     They then have a back and forth about these young

23     children of Mr. Burne.

24         We also have Mr. Burne sharing what he refers to

25     as the motherhood of child pornography with Mr.

1    Gaccione.  And we have Mr. Gaccione admitting in his

2    interview with law enforcement agents that he sent

3    pictures of his daughter to someone on the internet.

4          Now, I know the Court will recall that at the

5    change of plea there was some consternation by Mr.

6    Gaccione about the fact that he never sent pictures of

7    his daughter.  Whether that did or didn't happen is not

8    what's driving the government's recommendation;

9    obviously, the production charges are.

10          What we do know, however, is that Mr. Gaccione

11    admitted that he sent the pictures when he spoke to law

12    enforcement that day.  We also know that while he was

13    midterm molesting his child every week, he told her

14    that he needed to take pictures of her so that he could

15    send them to people on the internet.  We also know from

16    the chats we have with Mr. Burne and Mr. Gaccione that

17    after Mr. Gaccione refers to his 15-year-old daughter,

18    who was actually 14, that he sent six images.  And that

19    we know from the metadata on the images and from the

20    production count at Count Six, that Mr. Gaccione took

21    pictures of his daughter a mere few days before he sent

22    images to Mr. Burne.

23          I raise this to show the nature of the crime and

24    to paint a picture of who Mr. Gaccione was.  In his

25    memorandum, the defendant has taken -- made an effort,

1    and I expect he will here today, to speak to how he's

2    grown as a person and how he has shown true remorse.

3    Although I take issue with that as a matter of

4    principle, I think looking to positive steps he may

5    have taken in the last two-and-a-half years is really

6    not what should be driving the sentence.  We need to

7    look at him as a person as a whole over his lifetime.

8         What we know from Mr. Gaccione's own words that

9    are in paragraph 138 of the PSR is that Mr. Gaccione

10   was violent with his family.  He said that when he

11   learned of his wife's extramarital affair, he smacked

12   her.  He reported that another time he assaulted her

13   until she choked up blood.  The victim, when I met with

14   her on Tuesday, talked about her father having these

15   rages and hiding in a bedroom with her younger brothers

16   and sisters and talking about the monster outside.

17        In paragraph 140 during this time of apparent

18   remorse and growth, Mr. Gaccione spoke in July 2018 and

19   expressed having, quote, "vivid dreams about revenge of

20   his family," close quote.  Clearly this shows a lack of

21   remorse at least as of July 2018 when he is blaming

22   somebody else for what has caused him to be in prison

23   such that he is causing -- such that he is seeking

24   revenge on his family.

25        Mr. Gaccione has reported having a challenging

1   upbringing as a child.  That still does not explain how

2   he can molest his daughter and then reach out to others

3   to seek images of children being molested and to share

4   images whether of his daughter or somebody else.  As a

5   survivor of abuse, he should have been acutely aware of

6   the harm that it inflicts and carries.

7         The defendant has also not been a model prisoner

8   as we know from the PSR in paragraph 111.  He's had

9   three disciplinary matters during his time at the

10  Wyatt.  He appears to be insolent and not responsive or

11  not engaging in the behavior he should be.  I'd like to

12  briefly respond to some of the points raised in the

13  defendant's memo.

14        The defendant makes a challenge as to the

15  double-counting in application and the driving up of

16  the numbers of the guideline calculations.  If there

17  was a legal challenge to the guidelines for the

18  defendant to make, the time to have made them was at

19  the draft PSR stage or even now.  None was made.

20        The defendant has attacked the guidelines as

21  lacking credibility.  That argument has been raised

22  time and time again over the 12 years that I've been

23  prosecuting these cases and yet the Sentencing

24  Commission has not changed the guidelines.  The Court

25  is obviously free to consider the guidelines and vary

1    upward or downward as it sees fit, but the guidelines

2    have remained the same to Count Four, the harm that is

3    occasioned by the various ways in which a crime can be

4    committed.  But all that said, this attack on the

5    guidelines is essentially a red herring.  And let me

6    explain why.

7         The defendant neglects, first at the outset,

8    that he effectively received a seven-point decrease

9    because of Chapter 5, Part A requires that when his

10   adjusted offense level reached 50, it would get dropped

11   down to 43.  So to the extent there were seven points

12   that he challenges or is upset about, there was no

13   effect to them.  As far as the challenge to the

14   specific enhancements, the defendant challenges the

15   enhancements as to computer use and the number of

16   images which would be four points.  Then he also claims

17   that the pictures are grouped separately and that

18   drives up the guidelines.

19        Well, under the grouping rules that the Court

20   went through earlier today, the distribution of child

21   pornography and the possession of child pornography

22   counts, Counts Seven, Eight and Nine, resulted in one

23   point because they were grouped as one unit, and they

24   were added to a 40-point offense level.  So all of this

25   smoke is smoke about all those challenges.

1          With respect to the challenge to grouping, the

2     grouping rules are an intentional design of the

3     guidelines and of the Sentencing Commission to address

4     the distinct harms occasioned by certain types of

5     crimes.  Production of child pornography, sex

6     exploitation of a minor is one of the crimes that the

7     Commission has specifically excluded from grouping

8     rules and provides that it will be accounted for

9     separately.  And that was done correctly in the

10    guidelines.

11          Clearly, anyone in their right mind would not

12    think that just because somebody has been molested

13    once, if they are molested two, three, four, five and

14    six times thereafter, the second through six times are

15    not a distinct harm.  So what the defendant is asking

16    you to consider is basically let's group all five times

17    where the defendant molested and photographed that

18    molestation of his daughter because whether it was one

19    time or whether it was six times, it's the same harm.

20    Not true and just completely counter to any sense of

21    decency.  And again, as a practical matter, those

22    grouping rules had very little effect on the increase

23    in the guidelines because everything was brought down

24    seven points.

25          The defendant also claims that the guidelines

1    are created in a conference room, not among

2    practitioners.  I think the judges that have sat on the

3    Sentencing Commission, including the Honorable Charles

4    Breyer, who I practiced for ten years in front of,

5    Judge Patti Saris, Justice Pryor of the Eleventh

6    Circuit, all of those judges may take issue with

7    basically being called wrong; who don't know anything

8    about the reality of sentencing and the reality of

9    crimes.  We have their input on the Sentencing

10   Commission, and they are learned practitioners who

11   understand the impact of the guidelines and the reasons

12   behind them.

13        The defendant also claims as to the victim when

14   he suggested that a lifetime sentence is not

15   appropriate that, quote, "the damage is not beyond

16   repair," end quote.  Hope and potential abound for the

17   future.  I hope hope and potential abound for this

18   child, but right now she's struggling and she has not

19   been able to move beyond this.  And she is not someone

20   who is going to recover quickly from this.

21        The defendant has also made an Eighth Amendment

22   challenge.  The case law that he cites, frankly,

23   inapposite.  The *Graham* case that he cites does not

24   deal with lifetime sentences as to child pornographers

25   who are adults when they are sentenced.  It deals with

1    a juvenile case as to lifetime sentences.

2         There also are -- it is a conflated argument, I

3    will say, in that the sentence that the government is

4    seeking is not retribution, it is not made for reasons

5    beyond punishment which is what obviously *Furman vs.*

6    *Georgia* and the other cases would obviously prohibit as

7    with the Eighth Amendment.

8         The sentence that is recommended by the

9    government is one that is made based on an interest in

10   punishing this defendant and protecting society from

11   him.  In deterring him, should he ever get out and

12   others who are like him, from committing this sort of

13   heinous atrocity on any child, but particularly their

14   own children.  And it also is so that we can seek some

15   sort of consistency in these cases.

16        In our memorandum, we set forth a number of

17   these cases that this Court, as well as Judge Smith,

18   has considered and has sentenced defendants.  It's a

19   very, very difficult task as I write up the memorandum

20   and as I consider an appropriate sentence.  I can only

21   imagine how it is to sit in your Honor's chair when

22   you're trying to decide what's worse, molesting three

23   children four times or molesting one child hundreds of

24   times?  I don't know the answer to that.  What I do

25   know is that each of those sentences warrants a life

1    sentence because Mr. Gaccione is a monster.  He is a

2    monster who chose to take away his daughter's childhood

3    and to scar her forever.  And he is a monster who

4    risked -- who presents a risk to others based on what

5    we know about him.  And he is somebody who should never

6    ever walk out of the doors of a prison again.

7          At this point I ask if -- can I check and

8    see --

9          (Brief pause)

10         MS. GACCIONE:  Hi.

11         THE COURT:  Good morning.  How are you?

12         MS. GACCIONE:  Good morning.  How are you?

13         THE COURT:  Good, thank you.

14         MS. GACCIONE:  I'm writing this letter on behalf

15   of myself and my daughter J███ for what the crimes Jay

16   Gaccione has impacted our life.  For J███, not only

17   did he take away her childhood, he took away her

18   education.  She can hardly read, write, spell, et

19   cetera.  He took away that special thing she should

20   have shared with someone special, not her dad.

21         She has anxieties from everything that has

22   happened.  Doesn't want pictures or videos taken of

23   her.  I feel Jay deserves to pay for his crimes.  What

24   he has impacted me from his crimes are the looks I get

25   from people in town, the anxieties, the depression, the

1    loss of my job.  I was there for 11 years.  Couldn't

2    work the hours they needed me for so I got no hours to

3    support the kids he left behind to support on my own.

4            I gave you everything I had to make this work.

5    It's pretty sad that you decided that I wasn't good

6    enough for you, that you had to look at little girls

7    and have sex with our daughter while I worked six days

8    a week at night to provide for the family.  You used

9    that time to do the awful things to our daughter,

10   J█████.  She will struggle for the rest of her life to

11   have a healthy and trusting relationship.

12           There is no excuse for what you did to J█████.  I

13   am so angry.  I will never stop being angry.  What you

14   did to me and the kids is unforgivable.  I never

15   thought in a million years the man that I loved for

16   many years could ever do something like this.

17           Now the kids have to be without their dad that

18   they knew and loved.  The kids are going through some

19   stuff.  I have one that is very angry.  One that is

20   confused on where his daddy is.  One that didn't

21   graduate because school was too much for him with

22   everything that happened.  He is very depressed.  One

23   that is always going to struggle in life.  One that

24   will always love her dad, but will never truly

25   understand what he did until she is so much older.

1        I will be strong for our kids and protect them

2   from everything I can and love them for the both of us.

3   I'm not a hateful person so I don't hate you, but I no

4   longer love you.  The little love I had left went away

5   when I had to listen to our daughter tell the officers

6   what you did to her and watch all four kids go through

7   basically a rape kit.  You have no idea how bad that

8   hurt me to see them go through that.

9        The 10 year old freaks out every time she hears

10  or sees a cop car thinking they are coming back.  This

11  is the hardest thing I have ever done to tell the kids

12  they will never see their daddy again.  I don't think I

13  will ever get that day out of my head because that was

14  the day my whole world crashed around me and I

15  questioned everything.  I don't think I will ever be

16  able to trust a man ever again.  I have you to blame

17  for that.

18       I will take care of the kids like I have always

19  done by myself.  I will make sure I teach them what a

20  healthy, loving relationship is supposed to be and

21  prevent them from being victims again.  Make sure they

22  move forward in a positive way.  The thought of the

23  kids never having a father in their life isn't fair to

24  them at all.  Thanks for showing me the kind of person

25  you really were.  I'm picking up the pieces of the life

1    the kids knew, and we will do it without you.

2         The only good thing that came out of this is

3    that you will never hurt me or the kids ever again, and

4    we'll be fine without you and better off.  Thank you

5    for listening to me.

6         THE COURT:  Thank you so much.

7         Anything further, Ms. Barton?

8         MS. BARTON:  Nothing, your Honor.

9         THE COURT:  Thank you very much.

10        Mr. Fitzgerald.

11        MR. FITZGERALD:  Thank you, your Honor.

12        I think everybody agrees this is kind of a

13   particularly difficult sentencing so I wanted -- the

14   government made some kind of, you know, explanations at

15   the very beginning of their presentation.  I'm going to

16   do the same, your Honor, that, you know, what I have to

17   say here I don't want to be misinterpreted, and I

18   certainly don't want it to be misinterpreted to the

19   detriment of Mr. Gaccione, okay.

20        I'm in no way using what they call "victim

21   blaming" in any of my argument here.  And I'm also not

22   splitting hairs or trying not to split hairs in a sense

23   of trying to avoid culpability.  And I also want to

24   just point out to the Court that Mr. Gaccione is very

25   much interested in the whole hearing here so if you've

1   seen him flat-faced or nonresponsive, that's because I

2   told him to do that.

3          So, your Honor, before I get into why I think

4   you should sentence Mr. Gaccione to a much lower

5   sentence of 25 years in prison, I just want to address

6   a couple of things that the government brought up.

7   First is I recommend or hope that the things that the

8   government mentioned out of my sentencing memo, you

9   remember the context in which I said them, as well as

10  the context in which they're presented in the PSR.

11         First, the comment about Mr. Gaccione having

12  vivid dreams of revenge on his family.  That was in the

13  course of his counseling, and he was having these

14  dreams, not daydreams, when he was asleep having these

15  dreams.  That's the kind of thing we want somebody to

16  disclose in counseling so they can work on that because

17  obviously there's a lot of turmoil going on in his

18  mind.  That's not the way it was presented.  So I would

19  like you to remember the context in which that came up.

20         The other is that I didn't make an Eighth

21  Amendment argument here, I didn't.  This is not an

22  argument about it being an unconstitutional sentence.

23  In fact, the guideline -- not the guideline, but the

24  2200 months is the maximum penalty of all the charges

25  stacked.  That's constitutional because Congress set

1     those limits.  The point about the Eighth Amendment

2     issues is I just want the Court to consider what a life

3     sentence actually means and what it means for Mr.

4     Gaccione.  And you have to go to the case law to show

5     that, what it actually means.

6           The last contextual disagreement I might have is

7     this issue of where I said that permanent damage; that,

8     you know, he shouldn't be treated as he's made

9     permanent damage.  The context of that comment is

10    murder is permanent, and that's the context that was

11    taken from the case law and everything.  When somebody

12    murders somebody, the victim is dead and they are never

13    coming back; that's permanent.

14          Certainly, Mr. Gaccione's daughter has suffered

15    trauma and it's going to take her an awful long time to

16    get over that, if she ever does get over that.  I would

17    say that, you know, the trauma and the damage and the

18    stages she's going through that have been described to

19    you are absolutely normal for somebody who has gone

20    through something like this.  But it's not permanent in

21    the way that being murdered is and that there's no

22    coming back.

23          She still has a life, and we hope certainly that

24    she's able to make something of that life.  That's not

25    to say that Mr. Gaccione didn't damage her, didn't

1    cause her trauma, didn't cause all of this, but it's

2    not permanent in the sense of the end of her life.

3          Now, the government says that sentencing should

4    be about the person, and I agree and I think the Court

5    agrees, it absolutely has to be about the person

6    because we're not here to ratify the guidelines, we're

7    here to sentence Mr. Gaccione.  In making that

8    sentencing determination, you have to look at what he's

9    done since he's been arrested; how he's reacted; how

10   he's lived these past two-and-a-half years because,

11   ultimately, there's an end to the sentence and he's

12   either someone who is going to grow, someone who is

13   going to get better mentally, or he's not.

14         What I'm suggesting in my sentencing argument

15   and in the sentencing memo is that he has shown rather

16   distinct growth in the time that he's been at the Wyatt

17   facility.  He's been there for now two-and-a-half

18   years.  I can tell you that when he first got in

19   probably for more than the first year he was a very

20   angry man.  I can tell you that I was not his favorite

21   person because nobody wants to hear that they might be

22   going away for life.  And, you know, those are the

23   discussions we had about what the maximum penalties are

24   and what he's looking at and what could happen to him.

25         I think it took a long time for him to really

1   grasp -- I mean, he hasn't fully grasped all of this,

2   he hasn't come to grips with it, but he's made

3   significant progress towards that, to the point where

4   now it's not denials or rationalizations that certainly

5   did come up during his interviews with the police when

6   he was initially arrested; that doesn't happen anymore.

7         Certainly, he can't tell you why he did this,

8   but I can tell you that he's not sitting around

9   wondering why he did this as other clients have, other

10  defendants have, instead of I did this and I'm sorry

11  for it and let's move forward.  Some of those

12  defendants -- some of those individuals sit around and

13  just wonder why this happened to me, why did I do this,

14  why did this happen to me?  That's not Mr. Gaccione.

15  He's moved beyond that into really understanding that

16  he did it, owning up to the fact that he did that, and

17  then just trying to move on from there.

18        He has participated in mental health counseling

19  out at the Wyatt.  We talked about that just a few

20  seconds ago.  For the most part, he's about at the

21  highest level that he can get for counseling out there

22  so he sees the counselor every four to six weeks when

23  the counselor comes in.  He sees a psychiatrist on

24  video for, you know, medication purposes.  But he's

25  doing what he can to address his mental health while

1    he's at Wyatt.

2          I don't agree that there's enough there, but

3    what there is, he's taken advantage of it.  He's taken

4    classes.  I listed classes in the sentencing

5    memorandum.  It may be listed in the PSR as well.  But

6    in there, not only mental health and some substance

7    abuse classes, but also sex-offender treatment classes.

8    So he's taken those steps.

9          The other thing he's done, your Honor, and this

10   is definitely unique among certainly defendants with

11   these charges but certain defendants in general, is he

12   has taken to be somewhat of the welcome wagon in the

13   pod where he's housed.  Now, I don't know if the Court

14   knows, but at Wyatt everybody charged with these types

15   of offenses, all sex offenders, are segregated from the

16   rest of the population.

17         So Mr. Gaccione has been in that group of

18   individuals for pretty much the entire time he's been

19   there.  And now when new people come in, when new

20   people are arrested and charged and everything and they

21   come in, he usually takes a minute to try and, you

22   know, either console them because they have been held

23   and they just don't understand why and all that and

24   they're sad.  He's offered them food.  He's offered

25   them a pillow in one instance to another client of

1    ours.  Just basic human decency type of reactions to

2    help them at least get more comfortable in the

3    facility.

4         That kind of unselfishness is not normal out at

5    the Wyatt or any prison, as far as I know, but

6    certainly that makes it distinctly unique.  And that

7    shows growth because he's not thinking about himself;

8    he's thinking outside of himself.

9         The other part of that is not just the other

10   prisoners who feel -- or that he reacts that way to; he

11   treats the staff with respect and he has the respect of

12   the staff out there.  I don't remember particularly the

13   situations of insolence or anything like that, but I'm

14   pretty certain those were early on during his time at

15   Wyatt.  At this point at Wyatt, he is fairly well

16   trusted amongst the staff.

17        And I'd just point out, your Honor, if you

18   didn't see Mr. Gaccione walk in, he's allowed a cane by

19   the medical staff and by the staff at the Wyatt.  I

20   point that out because a cane can very quickly become a

21   weapon, but he is trusted with that and I think that

22   shows a level of respect that the staff has for him

23   knowing that he's not a violent guy and not somebody

24   who is going to act out on other people.

25        Your Honor, the government's asked -- they've

1    said effectively a life sentence, but they've asked for

2    a life sentence; 60 years in prison even with good time

3    is well over I believe 55 years.  I apologize.  54

4    years is I think what it would come out to.  That's a

5    life sentence.  Should Mr. Gaccione actually live that

6    long, he would be 90 some-odd years old by the time

7    that happened.  And he is not going to live that long.

8    Most of us, frankly, are not going to live that long.

9         That's a life sentence so let's -- they could

10   have said 70, they could have said 80, they could have

11   said 50, they could have said 40; it's all a life

12   sentence.  I've asked for 25 years which I think is

13   potentially a life sentence, but there's also a

14   potential that towards the end he might be able to be

15   released.  And that light at the end of the tunnel,

16   however dim, is still a light at the end of the tunnel.

17   And I think that that's something that Mr. Gaccione

18   deserves if for no other reason than the steps he's

19   made since he's been held.

20        Judge, I said before that I don't want to be up

21   here splitting hairs, but the government listed several

22   different cases -- sex-offender cases, sex-offense

23   cases -- and unfortunately I think that brings up the

24   idea of splitting hairs.  Now we're going to say

25   Mr. Smith is worse than Mr. Brown, Mr. Bruce and

1    Mr. Jones.  And I disagree with the government that,

2    you know, one instance of molestation is somehow less

3    serious than two or three or four or five.  And I say

4    that because if I came up here and said to you that,

5    well, they only did it once so it's not that bad, the

6    Court would look at me sideways, okay.  It's all bad,

7    okay.

8         So when we try and take these other cases of

9    molestations and then try to grade who is worse than

10   the other, it's not something I relish.  There are

11   several clients of mine on that list and it kind of

12   forces me to weigh, but Mr. Gaccione is my client today

13   so I'm going to try to make a couple of distinctions

14   there.

15        Mr. Goodman, obviously he was sentenced to,

16   well, effectively a life sentence.  I can tell you

17   Mr. Goodman was very distraught after he was sentenced.

18   I was not here in the courtroom; what I hear from his

19   activities at the ACI -- excuse me, at Wyatt.  And Mr.

20   Gaccione was one of the individuals who tried to,

21   essentially, talk him down once he got back to the

22   Wyatt.

23        But Mr. Goodman's crimes I think are far, far

24   worse than my client's crimes.  And I don't want to get

25   into particulars why, but when we're talking about

1    infants, we all are a little more sensitive to the

2    damage that can be done there I think as opposed to

3    somebody who is much older.  I don't know why the Court

4    gave him the sentence that he did, but that's the

5    distinction I can see here, multiple victims and the

6    ages of those victims, which is distinctly different

7    from Mr. Gaccione.

8          Mr. Crisostomi was my client.  Mr. Crisostomi,

9    the victim there was younger than my client -- excuse

10   me, than my client's daughter.  Mr. Crisostomi wasn't

11   charged with distributing child pornography, for

12   distributing pictures of his daughter, but it came out

13   at the time of sentencing that pictures of his daughter

14   had been found on the internet.  They had been found by

15   I believe it's NCMEC or whatever the government agency

16   is.  So that makes it distinctly different from Mr.

17   Gaccione.

18         Mr. Leal was a completely different kind of

19   situation.  Really a statutory rape.  Very different

20   from this type of situation.  Mr. Jones, I understand

21   he had a life sentence that was overturned and appealed

22   and he ended up with 50 years to serve, but he was a

23   repeat offender so he was somebody who had gone out and

24   molested somebody and got out of prison and then did it

25   again or tried to do it again and that's why he had

1    such a long sentence.

2         But I'd say that Mr. Jones' behavior as a repeat

3    offender is worse than what Mr. Gaccione did if we have

4    to split hairs and kind of weigh, and he only got a

5    50-year sentence.  The government is asking for more

6    for Mr. Gaccione.  I would say that Mr. Jones has

7    demonstrated that he was dangerous because he went out

8    and tried to re-offend.  And Mr. Gaccione has not done

9    that.  He's not been in that situation.  So I would say

10   he's not as dangerous as Mr. Jones.

11        I don't again like this hairsplitting in trying

12   to weigh every little fact to try and come out with who

13   is worse than the other, especially when we're talking

14   about all of these sentences which are all severe.  The

15   25 years I've asked for, again, is already a severe

16   sentence.  I will not be here when Mr. Gaccione leaves

17   prison.  I will be retired and long gone.  The Court

18   won't be here.  Most of the people in here will not be

19   here.  That makes it, I think, a severe sentence, a

20   long sentence when we think about it that way.

21        The other thing that will happen at 25, and I

22   know the government's very concerned about this, but 25

23   years from now Mr. Gaccione is not going to be a danger

24   to his daughter.  She's going to be an adult.  She is

25   going to be on with her life.  But he's also not going

1  to be a danger to anybody else because he'll be over 60

2  years old.  He may be subject to civil commitment and

3  not actually released after that 25 years.  He may

4  still be in prison for some time.

5       But if he's released, he'll be on supervised

6  release for the rest of his life.  I'm assuming that

7  the Court would put him on supervised release for the

8  rest of his life.  But he'll be on supervised release

9  for a long period.  He'll have to register for the rest

10  of his life as a sex offender.  He'll be limited to

11  where he can go and what he can do, what kind of work

12  he could do if he's able to work at that age.

13       But there are programs and systems set up to

14  monitor people after these sentences out in the

15  community.  The government's concerned about his danger

16  to the public.  Well, that's satisfied by supervised

17  release, civil commitment, counseling, sex-offender

18  registration and all the other infrastructure set up to

19  watch people, watch sex offenders afterwards.

20       Your Honor, I said that 25 years is probably or

21  possibly a life sentence.  I say that because Mr.

22  Gaccione is not in great health.  About a year -- a

23  little over a year ago, he was treated for kidney

24  failure and spent, I believe it was, a week or ten days

25  at the hospital.  So he had to be removed from Wyatt

1    and taken to the hospital to be monitored.

2            Now, kidney failure is certainly no joke and he

3    has diabetes.  You can see he's obese.  He's got a lot

4    of factors running against him for a long life or a

5    longer life.  I've asked or suggested that he be placed

6    at FMC Devens to serve his sentence, and my primary

7    reason for that was the kidney disease.  I did have

8    another client that was sent there who was on dialysis,

9    had complete kidney failure, and I believe that is the

10   facility that treats kidney issues primarily within the

11   Bureau of Prisons.  We just happen to be right nearby

12   Devens.

13           The other thing that Devens has is a

14   sex-offender treatment program so it's especially

15   appropriate for Mr. Gaccione to go there for both of

16   those reasons; they can deal with his medical issues

17   and the sex-offender issues.  But even with them

18   dealing with his medical issues, there's no guarantee

19   he's actually going to live that long.  So on a 25-year

20   sentence, it's very possible he will die in prison.

21   But he also has that glimmer of light at the end of the

22   tunnel that I think is important for the Court to give

23   to him.

24           Judge, the only other thing I'd say is, you

25   know, I object to the guidelines when the guidelines

1    are miscalculated and Ms. Picozzi knows that because if

2    I think there's a miscalculation, I would certainly go

3    and tell them and that would be handled typically

4    before we get here to court.  The argument is not that

5    the guidelines were calculated; the argument is the

6    guidelines are just wrong.  They are.  And these

7    particular guidelines were not created by the various

8    judges that the government talked about there.  These

9    guidelines were driven by Congress and a consistent

10   ratcheting up of sex-offender guidelines across the

11   board since the imposition of the guidelines back in

12   1988.

13        I'm fully prepared to debate that all along.

14   They've only gone up; they've never gone down.  They've

15   only gone up by basis of legislative action.  Whether

16   it was the PROTECT Act or the 1996 Sex Offender Act,

17   that's how those guidelines were developed.  They

18   weren't developed by courtroom experience, and that's

19   all I meant by that.

20        So, your Honor, again, I don't want to spend too

21   much time on that.  I'm asking for 25 years.  It's a

22   fair sentence.  I think it's appropriate for Mr.

23   Gaccione.  It gives him that light at the end of the

24   tunnel to possibly make it out, and I think that the

25   Court can give him that light simply because he's made

1    these positive steps since he's been incarcerated so
2    far.  Thank you.
3              THE COURT:  Thank you, Mr. Fitzgerald.
4              Mr. Gaccione, do you want to say anything before
5    I impose the sentence?
6              THE DEFENDANT:  Sorry.
7              THE COURT:  Take your time.
8              THE DEFENDANT:  I don't know if I'm saying the
9    right thing or not, but when I came in, when I got
10   arrested, I was a total jerk, you know.  I only cared
11   about myself, you know.  I was stubborn, selfish, you
12   know.  Whatever I wanted to make myself happy is what
13   it was.  I didn't want to hear nobody else's pain.  I
14   didn't care.
15             For a long time I didn't want to accept what
16   happened because if I accepted what happened then, you
17   know, here I am same type of person that did something
18   to me and I didn't want to be that person.  It took a
19   long time to come to a point where I could talk about
20   things to what I've done and realize how bad it was.
21   There's not a day that goes by that I don't regret what
22   I've done.
23             I mean, my kids are my life.  I mean, I did
24   everything with them.  I'm not going to sit here and
25   say I don't know why I did this or what it could have

1    led to.  I'm not going to make excuses.  The bottom

2    line is I did something horrible, and I gotta live with

3    it for the rest of my life.  My daughter has to live

4    with it for the rest of her life.  My family.  Everyone

5    does.  I ruined a lot of people's lives for a stupid

6    mistake that just because I was selfish and just a

7    total jerk, you know.

8            And that's not me.  It's like I had to put a

9    wall up, I had to be this person just to protect myself

10   and I didn't know how to love people, I didn't know how

11   to treat people, I didn't know anything, you know.  I

12   come here and, you know, I get the counseling, I get

13   the, you know, medication and stuff.  And it took me a

14   long time to even talk about things to them and I did.

15   And that's when I realized, you know, talking about it

16   and realizing what I did is the only thing to do so

17   that you can better yourself and move on in life and do

18   the right thing.

19           So I got nothing in my life, you know, left, you

20   know.  I lost my kids, I've lost friends, family,

21   everything.  What do I do?  Do I stay negative and be a

22   jerk for the rest of my life or do I do something

23   positive?  So that's what I'm trying to do.

24           You know, I can sit here and say I'm sorry to

25   everybody in this room a thousand times.  That's just

1    words in my eyes.  Anyone can say that, you know.  But

2    if I can prove to people that you can change, that you

3    can make a difference, then that's when people realize

4    and they can understand and, okay, this person, he does

5    understand what he did.  He does, you know, regret what

6    he did.  And I do.

7            I'm not going to sit here and say, well, you

8    know, it's never going to happen again.  I don't know.

9    But I can tell you I don't want it to, and I'm going to

10   do whatever it takes not to let it happen again, you

11   know.  That's why I go to the classes, you know.  I

12   even go to parenting classes.  Like, I know I'm never

13   going to be out to see my kids again.  And I'm never

14   going to see them because I'm going to die in prison.

15           That doesn't mean -- even if I get 60 years, 50

16   years or life or whatever, and I know I'm not going to

17   get out, it doesn't mean I'm going to stop trying.  It

18   doesn't mean I'm going to stop, you know, and go back

19   to that person.  I don't like who I was, you know.  I

20   drank a lot, I did a lot of stupid stuff to make me

21   happy, and I found out helping other people when

22   they're down and they're suicidal at, you know, the

23   facility and I can help them, I feel better as a

24   person.

25           So no matter what happens here today, no matter

1    if I get out or not, I'm not stopping helping people.

2    I'm not stopping getting the counseling.  I'm not

3    because it's helping me, you know.  I'm a different

4    person than I was when I went in there, you know.  Like

5    I said, I can sit here and say I'm sorry, it will never

6    happen a billion times, but, your Honor, you know,

7    you've heard it, you know, it happens.  You have people

8    say it and they come back.

9         I'm just saying that I'm not stopping giving up.

10   I'm going to keep trying no matter what happens.

11   Actions speak louder than words, and that's what I've

12   learned, you know.  I'm not going to deny anything.  No

13   matter what I did, as much as I did or whatever happens

14   happened, it's all wrong, it's horrible.  Every day,

15   you know, I think about my kids and what I put them

16   through.

17        You know, watching TV, you know, I see families

18   on TV and, you know, how they're happy and stuff and

19   that's all I've ever wanted.  And to realize, you know,

20   I screwed that up because I was selfish and stupid and

21   I'm never going to have an opportunity to see my kids

22   grow the way I wasn't able to that I want for them

23   because I screwed up, there's not a day that goes by

24   that I don't regret what I did, you know.

25        No disrespect to her; she doesn't really know

1    me, you know.  She doesn't see how much I've changed in

2    the facility, you know.  She knows from what I've done.

3    I don't blame anyone for thinking this is how it is,

4    you know.  But again, that's how I was.  I broke the

5    law.  I did what I did.  I have to pay for what I did.

6         But I'm not that same person, and I just want

7    everyone to understand that if they gave me a shot to

8    prove to them that I'm not that same person.  I can't

9    say nothing else.  I'm sorry.

10        THE COURT:  Thank you, Mr. Gaccione.

11        THE DEFENDANT:  Thank you.

12        MR. FITZGERALD:  Stay up.

13        THE DEFENDANT:  Sorry.

14        THE COURT:  Mr. Gaccione, there is no doubt by

15   everything that I've read and everything that I've

16   heard today that you need to be severely punished

17   because of the severity of this heinous crime.  Your

18   lawyer by recommending 25 years agrees with that, as

19   well as obviously the government does by its

20   recommendation.

21        And I don't need to recount, I don't think, for

22   the victims or for the public or anyone else, what my

23   feeling is about the severity.  I don't need to any

24   further demonize you than your actions themselves do

25   alone.  That's not what today is about.  Ms. Barton's

1    allocution of what the crime was is what this Court

2    believes, and I don't need to repeat that, despicable

3    and reprehensible and unfathomable.

4          The question that the Court has grappled with

5    and has to grapple with is there is no punishment

6    that's severe enough for what you did.  The only

7    question becomes whether the Court imposes a sentence

8    that at some point might allow you to be released from

9    prison.  And if one merely looked at the seriousness of

10   the crime, the answer is easy, the answer is very easy;

11   you'd never get out of prison.  But the thing that I

12   have to look at here is the human being that stands

13   before me.

14         And one thing we haven't talked about, and I

15   don't necessarily need to because it's in the

16   presentence report and you now know that I've certainly

17   considered it, is what your background was.  You acted

18   against your child the way you were acted against.  You

19   watched your -- in addition to that, you watched your

20   sister be sexually molested at a very young age by an

21   uncle so you saw it even in the family.  You grew up

22   in, I think it was described by the probation

23   department, as horrible conditions; that no child in

24   this country or anywhere should go through.

25         There is no doubt in my mind or in science that

1    there is a correlation between what you suffered as a

2    child and what you've done here against your own

3    children and against society.  There's just no question

4    about that.  So the question becomes whether that cause

5    requires or mandates a cause for this Court to show

6    some mercy because that's what it would be if the Court

7    let's you out on the end.  Because as I've said, if you

8    look at the severity of the crime, it requires severe

9    punishment.

10       The problem with that analysis for this Court is

11   the victim and victims in this case, Mr. Gaccione.  And

12   we know that this is a lifetime scar because the scar

13   that you suffered has had a lifetime throughout yours.

14   I don't know how your child will deal with this.  I

15   don't know whether she will go out and abuse when she's

16   41, how awful that would be, I just don't know, but

17   anything short of a lifetime of imprisonment will not

18   give her the safety and security that she deserves.

19       Her having the comfort and the security and

20   safety of knowing that she will never see you again

21   unless she chooses to behind bars is the only thing I

22   can offer the victim in this situation.  And it is what

23   keeps me from imposing some element of mercy which is

24   oftentimes deserved for someone who was victimized the

25   way you were.

1          I don't do it out of malice, I don't do it out

2     of some political feeling about the situation.  I do it

3     singularly because the victim deserves that security.

4     She needs and the others in your family and your

5     ex-wife need to know that you're going to be locked up

6     for the rest of your life.

7          For what it's worth, Mr. Gaccione, I hope as a

8     human being that you continue to change.  I hope that

9     you continue your showing of mercy as a way of paying

10    back while you're in prison.  I hope you continue that

11    caring and counseling way that your lawyer effectively

12    described it because that would show your remorse if

13    you were to continue that.

14         The Court's going to therefore impose the

15    following sentence:  As to Counts One, Two, Three, Five

16    and Six, the Court imposes a period of 30 years.  As to

17    Count Seven, the Court imposes a period of 10 years.

18    As to Counts Eight and Nine, the Court imposes a period

19    of 10 years.  All of which shall run consecutively.

20         The Court also will impose a lifetime of

21    supervised release just with the standard conditions.

22    A fine isn't appropriate, neither is the additional

23    $5,000 because of your indigency, but the Court will

24    impose the $800 mandatory assessment.

25         Mr. Gaccione, as part of your plea

1   agreement -- is there a plea agreement?

2          MS. BARTON:  There is none.

3          THE COURT:  Mr. Gaccione, you have a right to

4   appeal the sentence I impose if you choose to appeal

5   it.  If you want to appeal, the important thing for you

6   to know is that you need to do it or have your lawyer

7   do it within 14 days of the entry of this judgment on

8   the record.  If you want help filing an appeal, just

9   ask the Clerk of Court and they will assist you in

10  filing the appeal.

11         You also have a right to appointment of an

12  attorney throughout all of the appeal, and the Court

13  will continue to appoint an attorney for you should you

14  wish to appeal the sentence I impose.  Again, I'd just

15  remind you that needs to be done within 14 days of the

16  entry of the judgement on the record.

17         Do you understand your appellate rights, Mr.

18  Gaccione?

19         THE DEFENDANT:  Yes, I do.  Thank you.

20         THE COURT:  You're welcome.  Thank you.

21         Ms. Picozzi, anything further from probation?

22         PROBATION OFFICER:  No, your Honor.

23         THE COURT:  Anything further from the

24  government?

25         MS. BARTON:  Two things, your Honor.

1        One, the government moves to dismiss the one

2   count that Mr. Gaccione did not plead to.

3        THE COURT:  Any objection?

4        MR. FITZGERALD:  No.

5        MS. BARTON:  And also in our sentencing memo, we

6   reference that we request the restitution be left open.

7   I do not anticipate -- I understand the realities of

8   it, but I just request it due to the victim issues.

9        THE COURT:  So a couple things.  One is Count

10  Four will be dismissed without objection.  Restitution

11  will be kept open for the statutory period of I believe

12  it's 75 days.

13        COURTROOM DEPUTY:  90.

14        MS. BARTON:  90 days.

15        THE COURT:  90 days.  One other housekeeping

16  matter.  The victim's mom mentioned the victim's name

17  which is now in the transcript.  I'm going to order

18  that that name be stricken from the record and sealed

19  or however Ms. Schwam will do it.  I want to make sure

20  that the name doesn't appear in any official record

21  that is public.

22        MS. BARTON:  Thank you, your Honor.

23        THE COURT:  Anything further, Ms. Barton?

24        MS. BARTON:  No.

25        THE COURT:  Mr. Fitzgerald?

1            MR. FITZGERALD:  Your Honor, I'm not clear on

2       the sentence, I'm sorry.

3            THE COURT:  The sentence is 2,280 months.

4            MR. FITZGERALD:  Okay.  Thank you.

5            THE COURT:  Thanks.  Mr. Fitzgerald, anything

6       further?

7            MR. FITZGERALD:  No, your Honor.  Thank you.

8            THE COURT:  Mr. Gaccione, I wish you well.

9       We'll stand adjourned.

10           COURTROOM DEPUTY:  All rise.

11           (Brief pause)

12           THE COURT:  Mr. Gaccione, I apologize.  The

13      attorneys correctly pointed out to me that perhaps the

14      record wasn't as clear as it should be in this kind of

15      case about the sentence.  I believe it was, but let me

16      make sure it is.  You have a right, and you need to be

17      here for that, which is why we brought you back into

18      the courtroom with both sides here.

19           The sentence of incarceration that the Court

20      imposed was as to Counts One, Two, Three, Five and Six,

21      30 years as to each of those counts to be served

22      consecutive to each other.  As to Count Seven, the

23      Court imposed 10 years to be served consecutive to

24      Counts One, Two, Three, Five and Six.  And 10 years as

25      to Counts Eight and Nine to be served consecutively

1    with each other and as to all the other counts.

2            Ms. Barton, did I speak it correctly?

3            MS. BARTON:  I believe you did, your Honor.

4            THE COURT:  Mr. Fitzgerald, did I speak it

5    correctly as you understood what I intended?

6            MR. FITZGERALD:  Yes, thank you.

7            THE COURT:  Mr. Gaccione, again, my apologies

8    for that.  I think the record is clear now.

9            MS. BARTON:  Thank you, your Honor.

10           COURTROOM DEPUTY:  All rise.

11           (Time noted:  11:47 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **CERTIFICATION**

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7    Official Court Reporter                 January 2, 2020

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25